FILED

MAY 2 2 2013

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS OFFICE

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Criminal No. __13-30103-GPM__ |
| | ) | |
| MICHAEL PATRICK SULLIVAN, JR., | ) | |
| | ) | Title 18 |
| Defendant. | ) | United States Code, Section 1349 |
| | ) | |

## INDICTMENT

**THE GRAND JURY CHARGES:**

### I. Introductory Statement

1.      Beginning on or about the 5th day of December, 2006, and continuing until on or about the 24th day of January, 2012, in Bond, Clinton, Fayette, Franklin, Madison, Monroe, Richland, St. Clair, and Williamson Counties, within the Southern District of Illinois and elsewhere, the defendant, **MICHAEL PATRICK SULLIVAN, JR.**, and others known and unknown, doing business as Vacation Max, Showcase Resorts, Timeshare Resale Advantage, LLC, TRA Las Vegas, LLC, Corporate Getaways, and Executive Vacations ("Vacation Max companies") conducted a telemarketing timeshare resale scheme targeting timeshare owners throughout the United States, Canada, and elsewhere.  The Vacation Max companies falsely represented or implied that they had found buyers for the consumers' timeshare interests and solicited fees of up to several thousand dollars from each consumer in purported pre-paid closing costs and related expenses.  The purported sales did

1

not occur, promised closings did not take place, and, except for a very small number of sales at bargain basement prices, the companies did not successfully sell any consumer's timeshare interest. After Showcase Resorts made some initial and unsuccessful attempts to market timeshare interests, it then became apparent there was no substantial market in timeshare resales. But representations implying there was such a market nevertheless continued. After it became apparent that there was no substantial market for timeshare resale, the companies stopped devoting any substantial resources to marketing their clients' timeshare interest. A substantial portion of the fees were paid to individual telemarketers; the balance was kept by the company and its owner, **MICHAEL PATRICK SULLIVAN, JR**.

2.      Between January 1, 2007, and approximately January 24, 2012, the Vacation Max companies collected approximately $11 million and victimized over 3020 consumers in all fifty states, the District of Columbia, Puerto Rico and the U.S. Virgin Islands; all ten Canadian provinces and the Northwest Territory of Canada; Australia; Israel; and the United Kingdom. They victimized at least 12 consumers in at least nine of the thirty-eight (38) counties comprising the Southern District of Illinois.

## II. Participants

3.      Showcase Resorts, Inc., was a Nevada corporation formed in February 2007 whose President, Secretary and sole Director was the defendant, **MICHAEL PATRICK SULLIVAN, JR**. Showcase Resorts purported to be a timeshare resale company whose telemarketers represented that the company had buyers interested in acquiring timeshare properties. During the roughly two years it was in operation, Showcase Resorts failed to sell a single timeshare for a client, except at nominal prices that were a small fraction of what the timeshare owner paid for their property. Showcase

Resorts operated from an office on East Sahara Boulevard in Las Vegas, the address listed on the company's website.

4.        Vacation Max, Inc., (VM) was a Georgia corporation originally incorporated in 1996 as Manufacturing Software Solutions, Inc.  The business went dormant, although its corporate charter remained alive.  The corporate charter was then acquired by, or at the direction of, **SULLIVAN** who then renamed the company Vacation Max, Inc. in September or October, 2009.  VM did no business in Georgia and was registered as a foreign corporation in the State of Delaware.  VM ostensibly had its principal place of business in Wilmington, Delaware, but in fact did no business there.  Its ostensible principal place of business was only a virtual office where VM occupied no space, but could receive mail there to be forwarded elsewhere.  VM's phones had a Delaware area code, but they were cell phones physically located in Las Vegas, Nevada, where the business actually operated.  At various times VM had its mail forwarded from the virtual office in Delaware to addresses in Las Vegas, Nevada and Michigan, but those addresses were simply mail drops.  The space VM actually occupied was leased in the name of Hot Girls Entertainment, Inc., and was located at 3281 South Highland Drive, Suite 803, Las Vegas, Nevada.  Though representing itself to be a firm which marketed and sold timeshares, VM's offices had no exterior signage and its exterior glass windows were covered up so that it was impossible to see inside.  **SULLIVAN** and his co-conspirators went to great lengths to conceal the physical location of VM and its connection to **SULLIVAN**.  Its President was a **SULLIVAN** nominee, but **SULLIVAN** paid for the expenses related to VM's virtual office and was in effective control of the business.  VM was a timeshare resale company whose business model was to lead timeshare owners into believing that there was a market for timeshare resales and that the

3

company had potential buyers with a demonstrated interest in acquiring timeshares at or near the original purchase price.

5.      Timeshare Resale Advantage, LLC, was a Nevada corporation formed in August 2008. **SULLIVAN** was listed as the "Manager" and registered agent in filings with the Nevada Secretary of State. The business operated on East Sahara Boulevard in Las Vegas. Its business model was the same as VM's, deceiving timeshare owners into believing that a closing on their timeshare was imminent and then pocketing the advanced fees paid to the company by defrauded timeshare owners.

6.      TRA Las Vegas, LLC, was a Nevada corporation formed in November 2008. The manager and registered agent was a **SULLIVAN** nominee, but the business was under **SULLIVAN'S** effective control. Its business model was as fraudulent as VM's.

7.      Corporate Getaways was a Delaware business that was issued a Delaware business license on March 1, 2011. The business operated out of a virtual office located in Wilmington, Delaware. Documents relating to the operation of the business were signed by **SULLIVAN** nominees, but the business was under **SULLIVAN'S** effective control. Its business model was as fraudulent as VM's.

9       Executive Vacations was issued a "Certificate of Business: Fictitious Firm Name" by Clark County, Nevada, on December 23, 2011. The Certificate was signed by a **SULLIVAN** nominee, but the business was under **SULLIVAN'S** effective control. Its business model was as fraudulent as VM's.

10.     **SULLIVAN** is a resident of Las Vegas, Nevada. He was in effective control of Showcase Resorts, Vacation Max, Timeshare Resale Advantage, TRA Las Vegas, Corporate

4

Getaways, and Executive Vacations, which for all practical purposes were the same business operated under different names in different locations in Las Vegas.

### III. The Scheme

8.      Showcase Resorts, Vacation Max, Timeshare Resale Advantage, LLC, TRA Las Vegas, LLC, Corporate Getaways, and Executive Vacations engaged in a scam intended to deceive consumers into believing there was a market for timeshare resale and that these timeshare resale companies had corporate entities or individuals interested in buying timeshares.[1]

9.      A telemarketer referred to as a "fronter," "front caller" or "opener" would place a cold call to a timeshare owner from lead lists of timeshare owners obtained from list brokers. The fronter would ask if the timeshare owner had an interest in selling his/her timeshare unit. If such an interest was expressed, then a "closer" would make a call back to the prospect. Once the closer got on the phone with the prospect, he would tell the prospect that the company had one or more "corporate buyers," "buyers," or "offers" for units in the timeshare resort where the prospect's unit was located. Whatever the individual telemarketer's sales pitch, the goal was to create an impression that there was concrete, tangible interest in the prospect's timeshare which would lead to a closing from which the prospect would recover all, or substantially all, of the original purchase price. Telemarketers led prospects to believe that a closing on the property would occur within the near future, often represented to be within sixty to ninety days. Telemarketers then processed charges against the

---

[1]      As used in this indictment, "timeshare" refers to a type of fractional interest in real estate in which the owner has the right to occupy particular premises for a specified period of time. What constitutes a "timeshare" depends upon the law of the state in which the real estate is located.

consumers' credit cards, or solicited the mailing of a check in payment of imaginary services produced by the company.

10.     Sometimes specific closing dates were made up by the closer and given to the timeshare owner. Projecting a closing date sixty to ninety days out had the effect of postponing when customers would realize that they had been deceived, for the purpose of delaying calls to their credit card companies to charge back the fees. Delaying that inevitable reporting by the client was important to the success of the scheme, since customer complaints would almost certainly result in charge backs against the company's merchant account and thus jeopardize the ability of the company to process bank card transactions.

11.     After the customer paid the ostensible closing costs by bank card, automated clearing house (ACH) debit, or check mailed to one of the companies, the timeshare resale company would mail the customer a contract to sign and return. Rather than a contract for the sale of the property (which the owner was led to believe was certain to occur), the contract instead obligated the company to provide only marketing and advertising services.

12.     As the original sales call was unrecorded, the VM entities could claim that marketing and advertising was all that they had ever agreed to provide and that any impression that the consumer may have formed that there was a concrete offer for the customer's unit, or genuine interest by a qualified buyer, was a "misunderstanding" on the customer's part.

13.     Despite collecting approximately $11 million from consumers for timeshare resale services over a period of five years, none of the VM entities were instrumental in selling a single timeshare unit, other than a very few sales at a very small fraction of what the timeshare owner had originally paid. There were no sales at or near the original purchase price.

6

14.     Showcase Resorts, the first in the series of timeshare resale companies associated with **SULLIVAN**, tried various techniques to market timeshares. They established a storefront in Las Vegas and passed out flyers. They advertised on local radio stations in Las Vegas. None of the marketing techniques attempted by Showcase Resorts was the least bit successful. It thus became apparent to **SULLIVAN** and those who worked with **SULLIVAN** that there was no substantial market for timeshare resales and no genuine interested buyers. A market at which timeshare owners could obtain a substantial portion of their original purchase price simply did not exist. Yet, after it became apparent that no such market existed, **SULLIVAN** and the telemarketers who worked with him continued to use a sales pitch designed to mislead timeshare owners into believing that there was indeed a genuine market for timeshare resales and substantial interest in acquiring timeshares in the prospect's resort.

15.     Sometime during the operation of Showcase Resorts, but before the establishment of the other VM entities, telemarketers from other Las Vegas timeshare resale scams began closing for Showcase Resorts. They brought with them clever sales techniques that had proven to be effective in defrauding timeshare owners. Among the techniques that they brought with them was a sales pitch that was referred to internally as "the corporate pitch."

16.     The corporate pitch consisted of a collection of falsehoods based upon the central lie that there were corporations working with Showcase Resorts interested in acquiring blocks of units (as many as twenty to thirty) to reward employees, entertain business clients, and for undefined "tax purposes." The corporate pitch had apparently been very successful at other companies and soon after it was introduced to Showcase Resorts, it became the dominant sales technique. The moment it was

7

introduced, sales dramatically increased, drawing other closers from other timeshare resale corporations to Showcase Resorts because they could make lots of money there.

17.     There was nothing true about the corporate pitch. There was no business, corporate or otherwise, that had expressed interest to Showcase Resorts in acquiring blocks of timeshares. There were no personal visits, telephone calls or email communications from anyone purporting to be a representative of a corporation interested in acquiring timeshares. There wasn't a shred of evidence from which a reasonable belief could be formed that there was any truth to any aspect of the corporate pitch. There was no objective basis for anyone working at Showcase Resorts, Vacation Max, Timeshare Resale Advantage, LLC, TRA Las Vegas, LLC, Corporate Getaways, or Executive Vacations to believe that there were any corporate buyers.

18.     Although **SULLIVAN** did attempt to reign in some of the more extreme sales practices of his closers, he still tolerated, and even encouraged, the deception. For instance, while he instructed telemarketers not to promise specific closing dates, he didn't prohibit them from implying that a closing would take place within the near future, for instance, in sixty to ninety days. **SULLIVAN** sanctioned the misrepresentations but wanted them to be vague and short on details. The foundation of the business and sales model pursued by Showcase Resorts, and the timeshare resale companies that followed, was deceiving the timeshare owner into believing that a substantial market for timeshare resales existed and that Showcase Resorts had actual clients interested in acquiring timeshare units in the timeshare owner's resort.

19.     Despite his meager attempts, **SULLIVAN** could not control the excesses of his closers. Many made up closing dates. Some gave the names of specific corporations for which the company was supposedly assembling blocks of timeshares. Some offered a "senior discount" for senior citizens

8

they bilked. Some even offered a "military discount" for veterans they fleeced. **SULLIVAN** gave into the pressure put on him by closers willing to make up almost any falsehood to generate generous commissions for themselves because they were generating substantial revenues for his company as well. When a manager attempted to control some of the outlandish statements of the closers, closers complained to **SULLIVAN** that it was interfering with the money flow. The manager was told to stand down because closers couldn't sell if they were upset. The operating philosophy of the companies could be best summarized by what became **SULLIVAN'S** often repeated admonition: "don't f**k with the money."

20.     When clients eventually called to inquire as to the status of their promised closing, they were directed to customer service representatives called "updaters." The role of the updater was to perpetuate the fraud by delaying customer credit card chargebacks and complaints to various State Attorneys General. Updaters falsely told clients that the delay in closing was attributable to the addition of more units to the corporate "block." The number of units recently added to the corporate block would increase with successive phone calls from defrauded customers. Other bogus excuses were also given. For instance, customers were told that the buying corporation had changed its fiscal year, and so the closing wouldn't take place until the next quarter. The goal was to give the client false hope, delay the credit card charge back process until a charge back would be no longer possible, or hope that giving the client the runaround would cause her to simply give up trying to get her money back. In general, the approach taken by the updater was to try to explain away the delay and kindle the false hope that the company's promises would eventually be fulfilled, when they never would be.

21.     Telemarketers who were "fronters" and "closers" earned a percentage commission paid from the fee collected from an individual victim. The percentage earned by the telemarketer increased

9

with the telemarketer's success.  Those that produced higher sales received a higher percentage of the fees.  Telemarketers who were very successful at timeshare resales were not so because they were particularly good salesmen.  They were successful and made lots of money because they were especially good liars.  So the commission structure was designed so that the very best liars were rewarded with the highest percentage of the fees, up to a full one half of the fee bilked from an individual consumer.

22.     The timeshare resale companies went through a succession of names.  This was made necessary because of the infamous reputation that Showcase Resorts had achieved.  Many unhappy clients of Showcase Resorts made complaints in online blogs trashing the company and its telemarketers.  There were a growing number of Better Business Bureau complaints and complaints made to various State Attorneys' General.  With the creation of Vacation Max in early 2009, **SULLIVAN** tried to insulate himself from any paper trail connecting him with his new company and conceal the fact that Vacation Max, like Showcase Resorts before it, operated the same timeshare resale scam in Las Vegas.  What started out initially as a business that advertised a physical presence in Las Vegas and utilized, albeit for a short time, a store front on a busy Las Vegas boulevard advertising timeshare properties to the public, became a shadowy operation skulking behind blacked out windows in an unmarked office rented in the name of "Hot Girls Entertainment" that hid Vacation Max's business activities from public view.

23.     The established, proven, and highly successful sales pitch that was used by the telemarketers for Showcase Resorts, Vacation Max, Timeshare Resale Advantage, LLC, TRA Las Vegas, LLC, Corporate Getaways, and Executive Vacations contained material misrepresentations of fact and misleading statements to prospective customers, including the following:

A.     Telemarketers falsely represented or implied that their companies had received substantial interest in the customer's time share.  In most cases they falsely represented or implied that they were working with a corporation interested in acquiring timeshare units in the timeshare owner's particular resort.

B.     Telemarketers falsely represented or implied that a sale would occur or that a closing was scheduled or would be concluded on the property in the near future, often sixty to ninety days hence.

C.     Telemarketers falsely represented or implied that the fees they solicited were for deed and title searches, document preparation, and for similar expenses.

D.     Telemarketing agents called "updaters" provided false information to complaining clients who called to check on the status of the promised sale of their timeshare unit. They variously represented to clients that additional units were being added to the consumer's timeshare in the "corporate block," otherwise misrepresented or deceptively implied that the companies indeed had an offer or buyer for the property, and offered various made up excuses as to why the closing had not taken place on their timeshare units as promised and represented.

24.     The representations made in the sales pitch were false and fraudulent, *inter alia*,  in that there were no corporations working with any of the companies to assemble a "corporate block" of timeshares, the offers on the consumer's timeshares  were a fantasy, the picture painted of a viable timeshare resale market was a mirage, any closing dates were totally make believe, and the purported purpose of the fees was a pure invention by the telemarketer.   The fees were not being used for closing costs, but were being purloined to enrich the telemarketers and their bosses and pay for the continuing

11

expenses associated with the scam.  Only a relatively small amount was going to the cost of listing the property on company websites, if indeed the consumer's property was even listed there.

25.    The sales practices were false and misleading and the businesses were permeated with fraud in an industry pervaded by deceit.

26.    **SULLIVAN** utilized sales scripts that, in the circumstances in which they were used, created an appearance which was false and deceptive and calculated to induce a false belief as to the true facts.

27.    In connection with the transactions described herein, **SULLIVAN** engaged in a scheme involving deceit and trickery in order to gain an unfair and dishonest advantage over victims located in the Southern District of Illinois, throughout the United States, Canada, and elsewhere.

## COUNT I - Conspiracy
### 18 U.S.C. §1349

1.    From on or about the 5th day of December, 2006, and continuing through at least the 24th day of January, 2010, in the counties of Bond, Clinton, Fayette, Franklin, Madison, Monroe, Richland, St. Clair, and Williamson Counties, within the Southern District of Illinois and elsewhere,

### MICHAEL PATRICK SULLIVAN, JR.,

defendant herein, together with others both known and unknown to the grand jury, did knowingly and willfully combine, conspire, confederate and agree among themselves and each other to commit certain offenses against the United States as follows:

12

A.     To devise a scheme and artifice to defraud and to obtain money and property by means of false pretenses, representations, and promises, and for the purpose of executing the scheme, and attempting so to do, to knowingly cause to be sent and delivered by the United States Postal Service and by commercial interstate carrier, mail matter and other documents to and from residents of the United States, including residents of the Southern District of Illinois and to other residents of other countries, and to and from the offices, virtual offices and mail drops of the Vacation Max companies in the States of Nevada, Michigan and Delaware, and elsewhere, in violation of Title 18, United States Code, Section 1341.

B.     To devise a scheme and artifice to defraud and to obtain money and property by means of false pretenses, representations, and promises, and for the purpose of executing the scheme, and attempting so to do, to knowingly cause to be transmitted by means of wire and radio communication in interstate and foreign commerce, interstate telephone calls, credit card transactions, electronic fund transfers, and signs and signals, to and from cell phones belonging to and used by and on behalf of the Vacation Max companies in the State of Nevada, and elsewhere, including to and from residents of the Southern District of Illinois, in violation of Title 18, United States Code, Section 1343.

2.     In furtherance of and as a foreseeable consequence of the conspiracy, Showcase Resorts, Vacation Max, Timeshare Advantage, LLC, TRA Las Vegas, LLC, Corporate Getaways, and Executive Vacations and their telemarketers caused contracts and other documents to be transmitted by U.S. Mail and by commercial interstate carrier to the Southern District of Illinois.

3.     In furtherance of and as a foreseeable consequence of the conspiracy, Showcase Resorts, Vacation Max, Timeshare Advantage, LLC, TRA Las Vegas, LLC, Corporate Getaways, and

13

Executive Vacations and their telemarketers caused interstate telephone calls to be made to the Southern District of Illinois.

All in violation of Title 18, United States Code, Section 1349.

The offense occurred in connection with the conduct of telemarketing, in violation of the SCAMS Act, punishable under Title 18, United States Code, Section 2326(1).



NATHAN D. STUMP
Assistant United States Attorney

BRUCE E. REPEPRT
Assistant United States Attorney

STEPHEN R. WIGGINTON
United States Attorney

Recommended bond:  $10,000 unsecured

14